Filed 10/24/14

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----


| | |
|---|---|
| In re L.S., Jr., et al., Persons Coming Under the Juvenile Court Law. | C075626 |
| EL DORADO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.S. et al., <br><br> Defendants and Appellants. | (Super. Ct. Nos. SDP20130007 & SDP20130008) |


APPEAL from a judgment of the Superior Court of El Dorado County, Dylan M. Sullivan, Court Commissioner. Reversed with directions.

Sargeant & Conrad and Linda J. Conrad, under appointment by the Court of Appeal, for Defendant and Appellant J.S.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant L.S.

Edward L. Knapp, County Counsel, and Lauren C. Bowers, Deputy County Counsel, for Plaintiff and Respondent.


1

J.S. (mother) and L.S. (father), parents of the minors, appeal from orders of the juvenile court denying their petitions for modification and terminating parental rights. (Welf. & Inst. Code, §§ 366.26, 388, 395 [further undesignated statutory references are to the Welfare and Institutions Code].)  The parents contend the court applied the wrong burden of proof in denying their petitions for modification and abused its discretion in concluding there was insufficient evidence to grant the requested modification.[1]  The parents also contend the court and the El Dorado County Health and Human Services Agency (Agency) failed to comply with the notice requirements of the Indian Child Welfare Act (ICWA).  (25 U.S.C. § 1901 et seq.)  Finally, the parents argue the court erred in failing to find they had established the beneficial parental relationship exception to termination of parental rights.  We conclude that the juvenile court's failure to apply the proper burden of proof in ruling on the petitions for modification and the errors in the ICWA notice require reversal.

FACTS

Following the parents' request in January 2013 for a court-ordered case plan, the Agency filed petitions alleging the minors, L.S., Jr., age six, and T.S., age eight, were at risk because the parents were homeless, the minors were suffering emotional difficulties and the parents had not engaged in the voluntary service referrals.[2]  Various stresses in the family caused a breakdown of the family unit and increased emotional difficulties with the minors leading to the parents' request for help.  The court did not detain the minors.

---

[1]    Appellants join in each other's briefs.

[2]    The parents were offered family maintenance and family reunification services in a previous dependency case in 2009 and ultimately reunified with these two minors in 2011, although parental rights were terminated as to a sibling.

The jurisdiction report stated that, after the initial hearing, mother told the minors they might be placed in foster care and T.S. became hysterical. The social worker was able to calm T.S. and told mother such a conversation was inappropriate. Mother saw nothing wrong with it, believing the minors deserved to know what was going on. The social worker instructed mother not to discuss the case with the minors. Appropriate referrals were made and the parents were looking for housing. The court sustained the petitions.

Two weeks after the jurisdiction hearing, the Agency filed supplemental petitions (§ 387) alleging mother called the social worker and asked to have the minors placed in foster care for their safety because the family was homeless. The minors were taken into protective custody and, during the removal, told the social worker that father instructed them " 'not to tell the truth' " about where they had been staying or they would be placed in foster care. Prior to the detention hearing, T.S. was upset because father was mad at her for what she had told the social worker. T.S. became hysterical, crying and apologizing for saying something that got the parents in trouble. The court ordered the minors detained.

The report for the jurisdiction hearing for the section 387 petitions stated that mother admitted she and father had relapsed and used methamphetamine. Father minimized his drug use and blamed mother for his relapse. Prior to the jurisdiction hearing on the supplemental petitions, the Agency filed subsequent petitions (§ 342) based on the parents' substance abuse history and current use.

The April 2013 disposition report stated both parents were in inpatient drug treatment programs and were compliant with program requirements. At visits, the parents were attentive and nurturing, open to redirection, able to set limits and able to interact with the minors individually. However, there were visits which became highly emotional and they would complain and argue in front of the minors. The parents also had an ongoing problem with talking about the case or other adult matters at visits. As a

result of parental emotional responses and discussion of inappropriate matters, the quality of visits was inconsistent.  The minors always had difficulty after visits, being more emotional and less cooperative.  The social worker recommended bypassing services for mother because services and parental rights were terminated as to a sibling (§ 361.5, subd. (b)(11)) and for both parents due to their recent resistance to prior court-ordered drug treatment (§ 361.5, subd. (b)(13)).

The court denied services to the parents at the contested disposition hearing in May 2013 and set a section 366.26 hearing for September 18, 2013.  The report for the section 366.26 hearing concluded the minors were likely to be adopted as their ongoing behavioral problems were improving with stability in the foster home.  The minors looked forward to visits although L.S., Jr., was anxious both before and after visits.  The report indicated that the problems which led to the dependency were ongoing and the minors needed a permanent stable home.

Two days before the scheduled section 366.26 hearing, the parents filed petitions to modify the court's bypass order seeking an order for reunification services.  The parents alleged, as changed circumstances, they were actively participating in services on their own and father was employed.  The parents further alleged the proposed order was in the minors' best interests because the minors were bonded to them and reunification was the best permanent plan for them.  The court ordered a contested hearing on the petitions and combined the hearing with the section 366.26 hearing.

At the hearing in October 2013, there was a discussion of the proper burden of proof for the petitions for modification of the prior bypass order.  The Agency argued the parents had to show by clear and convincing evidence that providing services was in the minors' best interests while father's counsel argued that the proper burden for petitions for modification was preponderance of evidence.  The court, citing section 361.5 and California Rules of Court, rule 5.695, suggested that the same burden applied in modifying a bypass order as applied at the time it was imposed and that passage of time

4

did not lower the burden of proof for the parents in overcoming a bypass. The court reasoned that the petitions for modification were the mechanism to bring the issue of modifying the bypass order before the court, but, because the bypass conditions were shown by clear and convincing evidence and the court had found there was not clear and convincing evidence that reunification was in the minors' best interests at disposition, the appropriate burden to show that reunification was in the minors' best interests at the current hearing was also clear and convincing. The court made it clear it was familiar with the facts in the prior, as well as the current, case.

Mother testified about her current sobriety, her lengthy history of substance abuse and her current progress in the various programs she had engaged in. Mother described visits as "wonderful" and said that they gave her an opportunity to use her parenting skills when the minors had emotional problems. She described the interaction at visits with the minors which included meals, helping with homework and play time. She stated the minors asked about coming home but she redirected them because they were not supposed to discuss the case. Mother testified she had learned to budget and pay bills, deal with frustration and stay clean. Mother wanted to be reunified with the minors and felt they could be placed with her immediately. She believed reunification was in the minors' best interests because this time she was truly clean.

Father also testified about his current sobriety, the programs he had attended and the progress he had made in stabilizing his life. Father testified visits went well, the minors wanted to come home and it would mean the world to him to reunify with them. He asked the court for placement and services to ease the transition for the minors.

The adoptions supervisor testified the minors were in an adoptive placement. She described the minors' interaction with the foster parents as loving and had observed the minors seeking affection and guidance from the foster parents. She did not think the minors had special needs, noting their only diagnosis at the present time was Attention

Deficit Hyperactivity Disorder (ADHD). She stated that the minors would be adopted if parental rights were terminated.

An addendum report in January 2014 stated that, while T.S. had frequent explosive tantrums in the first two months of her current placement, the tantrums were decreasing and she was more able to calm herself and listen. T.S.'s most recent psychiatric diagnosis was ADHD and she was in ongoing therapy. L.S., Jr., was defiant at times and engaged in daily explosive tantrums but was making great progress in calming down. L.S., Jr.'s most recent psychiatric diagnosis was also ADHD. He was in weekly therapy, doing well in the current placement and had an easier time than T.S. establishing a relationship with the foster parents. The minors' tantrums decreased by 75 percent from when they were first placed in the current home. In school both were making progress. L.S., Jr.'s delays were minimal. T.S. consistently said she wanted to go home.

The addendum reported the parents visited twice a month. The parents were appropriate at the beginning and end of visits but during the visits sometimes lost focus on the minors' needs. In visits, the minors demonstrated parentified behavior and at times the parents allowed them to ignore rules without consequences. Both minors consistently said they wanted to go home, but both also felt connected to the current placement. T.S. said if she went home and was removed again she would " 'freak out.' " More than once, L.S., Jr., said he could live in the current placement forever. Although the parents had multiple services over many years, the social worker's assessment suggested they were unable to maintain the changes necessary to parent the minors. Meanwhile, the minors needed structure in their lives now. The addendum concluded the minors were adoptable, noting that the minors' therapist expressed concern about termination of parental rights, but the social worker felt the ongoing instability was more devastating to the minors.

Numerous documents were attached to the addendum including delivered service logs. The delivered service log for November 5, 2013, reported T.S. believed father lost a job because she forgot to change a clock to daylight savings time. T.S. expressed ambivalence about going home.

At the renewed hearing in January 2014, mother testified she had attended all visits since the last hearing and described a Christmas dinner visit. Mother said T.S. was very excited to see them at visits, talking about her school, bringing books for them to read and recently opening up about her foster home and her affection for her current caretakers. T.S. seemed to be seeking mother's approval for liking her caretakers. Mother testified L.S., Jr., was clingy and spent visits with his arms wrapped around her or father's neck but did talk about school and other things which interested him. Mother said they all interacted together. Mother was concerned the reports only said negative things about visits and explained her view of how various visits had gone in a more positive manner. Mother was not asking for immediate return of the minors, instead proposing an increase in visitation to show they could parent the minors outside visitation. Mother further suggested random testing to demonstrate her sobriety. She believed termination of parental rights would have a negative effect on T.S. and increase her behavior problems and, while L.S., Jr., would be upset, he might adapt more easily.

Father testified he believed that immediate return would have a major impact on the minors' stability and a transition period was appropriate. He, too, was asking for additional services such as testing.

The court denied the petitions for modification, finding the proper burden of proof was clear and convincing evidence that services were in the minors' best interests. The court stated that it had found by clear and convincing evidence at disposition both that the bypass provisions applied and that services were not in the best interest of minors and was again finding that providing services was not in the best interest of the minors. The court noted the parents had changed their focus of what they sought in the petitions and

7

pointed out there was only a month left of the statutory time, which would not be enough to offer services to deal with the parents' continuing problems.

After finding the minors specifically adoptable, the court addressed the beneficial parental relationship exception and found it did not apply to father because there was no evidence he had a strong bond with either child. The court found a significant bond between mother and T.S. and a strong bond between the two minors such that if the benefit exception were found it would have to apply to both minors. However, the bond did not outweigh the minors' need for permanency and stability. The court believed the minors would suffer detriment if parental rights were not terminated and it was not fair to the minors to ask them to continue to deal with the parents' recovery. The court terminated parental rights and selected adoption as the permanent plan.

Additional facts appear where relevant in the following discussion.

## DISCUSSION

### I

The parents argue the juvenile court applied the wrong burden of proof when denying their petitions for modification and abused its discretion in denying the petitions for modification because they had shown both changed circumstances and that the proposed order was in the minors' best interests.[3]

A.      *Burden of Proof*

"Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." (Evid. Code, § 115.) Thus, in dependency cases as in other areas of the law, a party is only required to prove a fact by a preponderance of the

---

[3]      Respondent asserts in a heading in his brief, "The court applied the appropriate burden of proof . . . ." (Unnecessary capitalization omitted.) In barely a page of text, he argues only that the parents cannot show prejudice. Respondent got off on the wrong foot at the outset when he misadvised the juvenile court judge on the standard of proof. We expect better preparation and more candor. This issue should have been either argued or conceded.

evidence. However, the Legislature has provided for a heightened burden of proof in several areas, e.g., removal of a child from the home (§ 361, subd. (c)); bypass of services (§ 361.5, subd. (b)); placement outside the United States (§§ 361.2, subd. (f)(4); 366, subd. (d)(4)); finding of adoptability (§ 366.26, subd. (c)(1)); and early termination of services (§ 388, subd. (c)(1)(B)(3)). We examine the interaction between statutes requiring different burdens of proof.

When a child is removed from parental custody, the juvenile court may order reunification services to assist the parents in reuniting with the child. (§ 361.5, subd. (a).) However, if any of the circumstances set forth in section 361.5, subdivision (b) are established by clear and convincing evidence, "the general rule favoring reunification is replaced by a legislative assumption that offering [reunification] services would be an unwise use of governmental resources" and the court may bypass services. (*In re Baby Boy H*. (1998) 63 Cal.App.4th 470, 478; *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744.) Nonetheless, services may still be provided if section 361.5, subdivision (c) is shown to apply. Section 361.5, subdivision (c) provides, in part: "The court shall not order reunification for a parent . . . described in paragraph . . . (11) [or] . . . (13) . . . of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." The statute provides that the clear and convincing burden of proof applies both to establish the bypass provision and to avoid bypass if reunification is in the best interests of the child.

Section 388, as it was written at the time of the combined hearing on the petitions for modification and termination of parental rights and as it currently appears, contains some sections which are governed by the clear and convincing burden of proof and some which are governed by the normal preponderance of the evidence burden of proof. (Cal. Rules of Court, rule 5.570(h)(1).) Subdivision (a)(1) of section 388 contains the requirements for a petition for modification of a prior order of the juvenile court "upon grounds of change of circumstance or new evidence." The petition must include facts

9

which make a prima facie showing that there is a change in circumstances and "the best interests of the child may be promoted by the proposed change of order." (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 672-673; Cal. Rules of Court, rule 5.570(e)(1).) The burden of proof for this subdivision is preponderance of the evidence. (Cal. Rules of Court, rule 5.570(h)(1)(C); *In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.)

However, section 388, subdivision (a)(2), which deals with a petition to modify prior orders bypassing services pursuant to section 361.5 subdivisions (b)(4) [caused the death of a child], (b)(5) [severe physical abuse of a child under age five] or (b)(6) [severe sexual or physical abuse], or to modify visitation to a child who is the subject of these subdivisions requires a showing by clear and convincing evidence "that the proposed change is in the best interests of the child."[4] (§ 388, subd. (a)(2).)

In this case, the parents' petitions for modification sought to modify the order bypassing services which was based on section 361.5 subdivisions (b)(11) and (b)(13). Section 388 does not apply a heightened burden of proof to petitions to modify bypass orders based on these subdivisions. Determination of a petition to modify is committed to the sound discretion of the juvenile court. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) However, the discretion of the juvenile court is limited by the statutory framework of dependency jurisdiction. (*In re Lisa R*. (1975) 13 Cal.3d 636, 643; *In re I.R.* (2014) 226 Cal.App.4th 201, 209.) Because section 388 did not permit application of the clear and convincing burden of proof to the parents' petitions for modification, the juvenile court abused its discretion in requiring them to meet the higher burden of proof in order to modify the bypass order.

---

**4** Similarly, section 388, subdivision (c)(3) requires proof by clear and convincing evidence to terminate services prior to the relevant review hearing. All other subdivisions of section 388 are subject to the preponderance of the evidence burden of proof. (Cal. Rules of Court, rule 5.570(h)(1)(C).)

10

We cannot conclude that the abuse of the court's discretion was harmless. This is not a case where there was no evidence of change or of best interests of the minors and the court did not simply misspeak when stating the burden of proof. The court heard extended argument on the issue and affirmatively concluded that a burden of proof not authorized by the relevant statute should apply. There were several reports and extensive testimony which resulted in conflicting evidence on both the degree that circumstances had changed as well as what was in the minors' best interests. It is for the juvenile court, not this court, to assess credibility and weigh the evidence using the proper burden of proof when exercising its discretion to grant or deny the petitions. (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318-319; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.)

At the October 2013 hearing, respondent and the court relied on the reasoning of *In re A.M.* (2013) 217 Cal.App.4th 1067 (*A.M.*) to justify grafting the burden of proof found in the bypass statute, section 361.5, subdivision (b), onto the modification statute, section 388. In *A.M.*, the mother sought a section 388 modification of a bypass order based on section 361.5, subdivisions (b)(5) and (6). (*Id.* at pp. 1074-1075.) The juvenile court granted the modification finding changed circumstances. (*Id.* at pp. 1073-1074.) Both the agency and the child appealed, arguing the juvenile court's order was based on an incorrect legal standard. (*Id.* at p. 1074.) The *A.M.* court reviewed the requirements in section 361.5, subdivisions (b) and (c) for granting bypass of services and for ordering services despite the bypass and held that, although mother brought a petition under section 388, the juvenile court was required to apply the provisions of section 361.5 subdivision (c), including the clear and convincing burden of proof, when determining whether to grant reunification services. (*Id.* at pp. 1075-1076.) The court concluded "Mother could not evade the requirements of section 361.5 subdivision (c) merely by waiting a few months and then seeking relief under section 388." (*Id.* at p. 1076.) The court in *A.M.* recognized the Legislature recently passed an amendment to section 388, which would have authorized the juvenile court to apply a clear and convincing burden of

11

proof in the case before it, but properly declined to rely on the statute because the events in that case arose before the effective date of the statute.[5]  (*Id.* at p. 1076.)

We respectfully disagree with the reasoning in *A.M.*  Section 361.5, subdivision (a) does not authorize a subsequent motion to modify seeking provision of services.[6] (*A.M., supra,* 217 Cal.App.4th at p. 1075.)  Absent a motion for reconsideration, in which the court would have applied the burdens of proof and the conditions to be proved found in section 361.5, subdivision (c), mother's remedy in *A.M.* was to use section 388 to modify the prior order.  The passage of time from the initial order to the petition for modification, by itself, is irrelevant.  Regardless of the passage of time, the petitioner must show changed circumstances and best interests of the minor to prevail.  The shorter

---

[5]    The court did state, without citation, that the Legislature's expressed view was that the amendment was declarative of existing law.  The *A.M.* court may have been misled by a Senate Judiciary bill analysis which stated that existing law permitted a party to file for reconsideration of an order denying services and cited section 388, subdivision (c).  (Sen. Judiciary Com., Analysis of Sen. Bill No. 1425 (2011-2012 Reg. Sess.) date of analysis June 18, 2012, p. 3.)  The citation in the bill analysis to subdivision (c) appears to have been a misprint.  That subdivision applies to terminating services prior to review hearings and, as previously noted, does apply the clear and convincing burden of proof.  The correct subdivision for generally modifying a prior order is section 388, subdivision (a) which, with some exceptions not applicable here, applies the preponderance burden of proof.  If the law at the time already provided for the higher burden of proof, no amendment would have been necessary.

[6]    Section 361.5 deals with the juvenile court's decision to grant or deny services at the time the minor is removed.  Subdivision (a) is concerned with the parent's right to services when the minor is removed and the time limits for offering services. Subdivision (b) lists the circumstances under which services may be denied.  Subdivision (c) deals with circumstances under which services may nonetheless be ordered despite a finding that bypass is proper under subdivision (b) and, by its terms, is limited to decisions to offer services only when section 361.5 applies.  The remaining subdivisions deal with providing services when the whereabouts of an absent parent become known (subd. (d)); providing services to incarcerated or institutionalized parents (subd. (e)); and actions to be taken by the court and factors to be applied when bypass is found (subds. (f)-(k)).

the time frame, the less likely that either can be shown. Similarly, the longer the minors have been out of the home and stabilizing in relative or foster care, the less likely it is that their best interests will be furthered by the proposed change. Further, the decision in *A.M.* suggests that its construction of the statutes was consistent with existing law. (*Id.* at p. 1076.) Such is not the case. Section 388 was amended by an urgency measure in August 2012 to prevent application of the preponderance of the evidence burden of proof to modifications of bypass orders pursuant to section 361.5 subdivisions (b)(4), (5) and (6). The author and supporters of the bill made it clear that the bill constituted a change in the law by imposing a higher burden of proof to modify bypass orders made pursuant to those subdivisions. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1425 (2011-2012 Reg. Sess.) date of analysis Aug. 3, 2012, pp. 3-4; see also fn. 5, *ante*.)

In this case, the court relied on a flawed, if seductive, analysis in applying a higher burden of proof than the statute requires. Remand is necessary to permit the court to determine the issues applying the correct burden of proof.

B.      *Denial of the Section 388 Petitions*

Because we reverse on the question of the burden of proof to be applied to the determination of the petitions to modify, we need not address the further question of whether substantial evidence supported the denial of the petitions.

## II

The parents contend the court and the Agency failed to comply with the ICWA because no notice was sent to the Blackfeet tribe and there was no ruling on whether the ICWA applied.

In the 2009 case, mother claimed no Indian heritage and father said he "may have" Sioux ancestry but never gave further information. At the jurisdiction hearing on the section 387 and section 342 petitions, the parents provided the ICWA-020 forms in which mother claimed Blackfoot heritage and father claimed Cherokee heritage. Father clarified that family research showed his heritage was Cherokee, not Sioux. The court

13

ordered the parents to meet with the social worker after the hearing and provide all known ancestry information for notice to the tribes.

According to the disposition report, when the parents met with the social worker, both parents denied Sioux heritage, stating that prior reports of that heritage were a mistake, and claimed Cherokee heritage. The social worker indicated that notices were sent to the tribes with information provided by the parents.

The Agency did send notices to the Cherokee tribes which included information on father's ancestry, but did not send notice to any other tribe or provide any ancestral information for mother. None of the noticed tribes responded that the minors were members or eligible for membership in the tribe. The court never ruled on the question of whether the ICWA applied.

The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, dependency actions. (25 U.S.C. §§ 1901, 1902, 1903(1), 1911(c), 1912.) The juvenile court and the Agency have an affirmative duty to inquire at the outset of the proceedings whether a child who is subject to the proceedings is, or may be, an Indian child. (Cal. Rules of Court, rule 5.481(a).) If, after the petition is filed, the court "knows or has reason to know that an Indian child is involved," notice of the pending proceeding and the right to intervene must be sent to the tribe or the Bureau of Indian Affairs (BIA) if the tribal affiliation is not known. (25 U.S.C. § 1912; § 224.2; Cal. Rules of Court, rule 5.481(b).) Failure to comply with the notice provisions and determine whether the ICWA applies is prejudicial error. (*In re Kahlen W.* (1991) 233 Cal.App.3d. 1414, 1424; *In re Desiree F.* (2000) 83 Cal.App.4th 460, 472.)

The parties focus on the Blackfoot/Blackfeet confusion and claim error in the lack of notice to the Blackfeet tribe. However, the state of the record is far murkier than the parties' arguments would suggest. In the prior dependency, mother claimed no Indian heritage. In this proceeding she initially claimed Blackfoot heritage, however, the

14

reported facts after meeting with the social worker appear to suggest that mother retracted her claim of Blackfoot heritage and either claimed Cherokee heritage, in which case, the ICWA notice should have had some information about her ancestry, or claimed no heritage, in which case the lack of information about her heritage in the ICWA notice was harmless. The juvenile court never clarified the facts regarding claims of Indian heritage or the adequacy of notice and never ruled on whether the ICWA applied. Because the facts of mother's claim and the notice required are unclear, we cannot imply the court found the ICWA did not apply. (*In re Levi U*. (2000) 78 Cal.App.4th 191, 199.)

Neither the Agency nor the court performed the duties required under the ICWA. (§ 224.3, subds. (a) & (c).) On receiving information of a claim of Indian heritage, the court and the Agency must inquire as to the tribal connection and ancestry of the parent. The Agency is then required to notice any federally recognized tribe of the proceeding including all known information. (*In re D.T*. (2003) 113 Cal.App.4th 1449, 1454-1455.)

In order for the court to make a determination whether the notice requirements of the ICWA have been satisfied, it must have sufficient facts, as established by the Agency, about the claims of the parents, the extent of the inquiry, the results of the inquiry, the notice provided any tribes and the responses of the tribes to the notices given. Without these facts, the juvenile court is unable to find, explicitly or implicitly, whether the ICWA applies. (*In re Levi U*., *supra,* 78 Cal.App.4th at p. 199; *In re E.W.* (2009) 170 Cal.App.4th 396, 404-405.) While the Agency may have performed its duty of inquiry, it failed in its duty to document it and to provide clear information to the court so the court could rule on the question of whether the ICWA applied.

However, the juvenile court also failed in its duty. Given the conflicting and inadequate information on mother's claim of Indian heritage, the court had a duty either to require the Agency to provide a report with complete and accurate information regarding the results of its inquiry and notice or to have the individual responsible for notice to testify in court regarding the inquiry made, the results of the inquiry, and the

15

results of the notices sent. Only then could the court determine whether the ICWA applied.

On remand, the Agency will have the opportunity to clarify mother's claim, gather her information, if necessary, provide notice to any identified tribes as required and present the relevant facts to the juvenile court. We observe that there is frequently confusion between the Blackfeet tribe, which is federally recognized, and the related Blackfoot tribe which is found in Canada and thus not entitled to notice of dependency proceedings. When Blackfoot heritage is claimed, part of the Agency's duty of inquiry is to clarify whether the parent is actually claiming Blackfoot or Blackfeet heritage so that it can discharge its additional duty to notice the relevant tribes. Once the facts are clear, the juvenile court will be able to make the appropriate finding regarding the applicability of the ICWA to this case.

### III

The parents contend the court erred in terminating parental rights, arguing they established the beneficial parental relationship exception. We resolve this issue in the event that, on remand, the juvenile court again denies the petitions for modification under the proper burden of proof. In doing so, we note that the analysis of the beneficial parental relationship exception, although similar in some respects, is distinct from the analysis in a petition for modification of whether a proposed change of order is in the best interests of the minors.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child. [Citation.]" (*In re Ronell A*. (1996) 44 Cal.App.4th 1352, 1368, original italics.) There are only limited circumstances which permit the court to find a "compelling reason for

16

determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) The party claiming the exception has the burden of establishing the existence of any circumstances which constitute an exception to termination of parental rights. (*In re Cristella C*. (1992) 6 Cal.App.4th 1363, 1373; *In re Melvin A*. (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(4); Evid. Code, § 500.)

Termination of parental rights may be detrimental to the minor when: "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) However, the benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575; *In re C.F.* (2011) 193 Cal.App.4th 549, 555.) "Even frequent and loving contact is not sufficient to establish this benefit absent a significant, positive emotional attachment between parent and child. [Citations.]" (*In re I.R.*, *supra*, 226 Cal.App.4th at p. 213.)

The parents regularly attended visits. The question is whether the minors would benefit from continuing contact. The minors repeatedly said they wanted to return home, however, the minors were also described as parentified. Undoubtedly the desire to go home was due in part to an emotional connection with the parents and in part to a need to act as caretakers for them. The strong desire to return home became more ambivalent as the minors became accustomed to a placement with structure and consistent expectations. The court found mother had a bond with T.S. but father had no significant bond with the

17

minors. Even assuming some level of bonding between the parents and the minors, examination of the relationship between the minors and the parents discloses that the bond did not constitute a substantial positive emotional attachment. At the outset of the dependency, mother told T.S. she and L.S., Jr., might have to go to foster care and T.S. became hysterical. Mother could not understand why making such a statement to a child might be inappropriate. Mother's explanation to the social worker was that she saw nothing wrong with it and thought T.S. deserved to know what was going on. This showed little understanding of age-appropriate communication and a certain indifference to the effect such a statement would have on an eight year old who had been in foster care before. About the time of the section 387 petitions, father instructed the minors to lie about where they had been staying and threatened them with foster care. Father showed more concern about his own needs than those of the minors to be comforted and reassured in a chaotic situation. Father showed this same indifference before the disposition hearing when he displayed anger toward T.S., making her upset for saying something that got the parents in trouble. T.S. believed she needed to take responsibility for father's anger just as she had taken responsibility for father losing a job because she had not set the clock to daylight savings time. While visits had many positive aspects, there were also negatives. Both minors had behavioral problems after visits. L.S., Jr., did not want to leave school to go to visits. In visits, the parents were inconsistent in handling the minors' outbursts, talked about the case or other adult matters in front of the minors, showed poor judgment, and did not set and enforce clear boundaries on behavior.

To avoid termination of parental rights, it is not enough to show that a parent-child bond exists. The quality of the bond must also favor continued contact. Here, the overall relationship between the parents and the minors did not show a positive emotional attachment and was marked by parental indifference to the minors' core needs for structure and stability. As a result, the benefit of continued contact did not outweigh the

18

minors' needs for permanence and stability. The court did not err in finding the beneficial parental relationship exception did not apply.

## DISPOSITION

The orders denying the petitions for modification and terminating parental rights are reversed. The case is remanded to the juvenile court for the limited purposes of applying the proper burden of proof to the parents' petitions for modification and determining whether the Agency complied with the notice provisions of the ICWA and whether the ICWA applies in this case. If the juvenile court grants the petitions for modification and/or finds after inquiry and any necessary notice that the ICWA applies, the court shall hold such further proceedings as are appropriate. If the juvenile court denies the petitions for modification and finds that the ICWA does not apply, the orders terminating parental rights shall be reinstated.

                                                   NICHOLSON      , Acting P. J.

We concur:

       BUTZ           , J.

       DUARTE       , J.

19